UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 06-208 (GK) |
| | : | |
| v. | : | |
| | : | |
| FRANK BERKELEY, | : | VIOLATIONS: 21 U.S.C. §841(a)(1) |
| | : | and §841(b)(1)(A)(iii) |
| Defendant. | : | (Distribution of 50 Grams or More |
| | : | of Cocaine Base) |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits its Memorandum in Aid of Sentencing, recommending that the defendant, Frank Berkeley, be sentenced to a term of imprisonment at the high end of defendant's Sentencing Guidelines' range (i.e., 188 months of incarceration), followed by 5 years of supervised release. In support thereof, the United States respectfully states the following:

Background

1.  On August 2, 2005, agents from the United States Drug Enforcement Administration ("DEA") and the Metropolitan Police Department ("MPD") met with a confidential source (hereafter referred to as "CS"), regarding the purchase of approximately sixty-two (62) grams of crack cocaine from the defendant, Frank Berkeley. At approximately 1:30 p.m., the CS placed a telephone call to Berkeley's cellular telephone, telephone number (240) 603-8934, regarding the purchase of

approximately 62 grams of cocaine. Berkeley informed the CS that the price would be seventeen hundred ($1700.00), plus two hundred ($200.00) owed from a prior debt. At approximately 1:40 p.m., agents followed the CS to the 1000 block of 44th Street, N.E., Washington, D.C., the pre-determined location. At approximately 1:35 p.m., Berkeley arrived in the 1000 block of 44th Street, N.E., in a multi-colored Chevrolet Caprice bearing Maryland license plate number 4AYY65. Berkeley exited the driver's side and entered the CS's vehicle, where he sat in the front passenger seat and engaged in a conversation about the CS buying between an eighth of a kilo (1/8) and a half of a kilo (½). Berkeley handed the CS a clear plastic wrap containing approximately 62 grams of suspected crack cocaine, in exchange for nineteen hundred ($1,900.00) dollars of pre-recorded DEA funds. Berkeley exited the CS's vehicle, and both parties drove away. That suspected crack cocaine was later submitted to the DEA Mid-Atlantic Laboratory, which confirmed that the substance was in fact cocaine base, also known as crack cocaine, and weighed 62.2 grams.

  2. On September 21, 2005, at approximately 11:35 a.m., Berkeley contacted the CS via telephone regarding the purchase of 62 grams of crack cocaine. Berkeley advised the CS he would be there (referring to the 1700 block of Benning Road, N.E., Washington, D.C.) by 12:00 p.m. At approximately 12:10 p.m., agents observed Berkeley arrive at the 1700 block of Benning Road, N.E., in a multi-colored Chevrolet two-door Oldsmobile with a rag top, bearing Maryland license plate MNS-216. Berkeley exited the driver's side and entered the CS's vehicle and sat in the right rear passenger seat and engaged in a conversation. The CS introduced Berkeley to an undercover agent (hereafter referred to as "UC") and they shook hands. Berkeley advised the CS to drive around the parking lot, and Berkeley handed the UC a clear plastic wrap containing approximately 62 grams of suspected crack cocaine, in exchange for seventeen hundred ($1,700.00) dollars. Moments later,

Berkeley exited the CS's vehicle, walked back to his vehicle, and exited the area. The suspected crack cocaine was later submitted to the DEA, which confirmed that the substance was in fact cocaine base, also known as crack cocaine, and weighed approximately 61.8 grams.

3. On July 11, 2006, Berkeley was indicted on two counts of Unlawful Distribution of 50 Grams or More of Cocaine Base, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(iii), for the events occurring on August 2, 2005, and September 21, 2005, and a warrant was issued for his arrest.

4. Berkeley was arrested on July 19, 2006, outside his residence, at 7002 Annapolis Road, Landover Hills, Maryland, as Berkeley approached and began to enter a Dodge Durango bearing Maryland license plate number 655M797, which is registered to Berkeley's father, James Siebert. During the search of Berkeley incident to arrest, agents seized approximately 31 grams of suspected crack cocaine from the right pocket of Berkeley's cargo shorts. Agents also seized a handgun located on the front floorboard of the passenger side of the Dodge Durango inside a canvas Adidas bag. The handgun was a Taurus 9mm with a round in the chamber and an additional 12 rounds in the magazine. Additionally, agents seized $91,980 in U.S. currency, wrapped with rubber bands, from the front passenger's seat in a canvas bag. According to the defendant's father, Berkeley has had sole possession of the 1999 Dodge Durango since mid-June 2006.

5. On August 3, 2006, attorney Doug Wood, Esquire, was retained as counsel and entered his appearance on behalf of the defendant. On September 29, 2006, with Doug Wood serving as counsel, Berkeley pled guilty to Count One of the Indictment. As part of the plea agreement, the government agreed not to prosecute Berkeley further for the conduct set forth in the Statement of Offense. The government promised to move to dismiss Count Two of the Indictment

in the above captioned case at the time of sentencing. Furthermore, the government promised to secure a letters of declination from the Maryland State's Attorney's Office and the United States Attorney's Office for the District of Maryland whereby each office would agree respectively not to prosecute Berkeley for the illegal conduct occurring on July 19, 2006, at the time of Berkeley's arrest. Finally, the government agreed not to oppose a three-point reduction for early acceptance of responsibility consistent with the guidelines and policies promulgated by the United States Sentencing Commission, Guidelines Manual (hereinafter "Sentencing Guidelines" or "U.S.S.G").

6. On October 5, 2006, defendant filed a motion to substitute counsel, and Harry Tun, Esquire, entered his appearance on behalf of Berkeley. On February 2, 2007, Berkeley filed a motion to withdraw his guilty plea, and the sentencing hearing date was vacated. Various pleadings were filed, and a full-day evidentiary hearing was held on Berkeley's motion to withdraw his guilty plea on August 9, 2007 ("the motion hearing").

7. On October 16, 2007, after receiving post-hearing memoranda from the parties, the Court denied Berkeley's motion to withdraw his guilty plea. Sentencing is currently scheduled for February 12, 2008, at 4:30 p.m.

## Statutory Penalties

8. Pursuant to Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(iii), Berkeley's conviction, a Class-A felony, carries a penalty of a term of imprisonment which may not be less than ten (10) years and not more than life, a fine not to exceed $4,000,000.00, and, a term of supervised release of at least five (5) years. A special assessment of $100 must also be issued under Title 18 United States Code, Section 3013.

Sentencing Guidelines

9. Under the Sentencing Guidelines, Berkeley's total offense level is 32. U.S.S.G. §§ 2D1.1(a)(3), 2D1.1(c)(5), 3C1.1.[1] The obstruction of justice enhancement is warranted here, pursuant to U.S.S.G. § 3C1.1, because Berkeley deliberately made false statements under oath in connection with his motion to withdraw his guilty plea.[2]

10. First, the Court found Berkeley's testimony not to be credible when he testified that Doug Wood "scared" him into accepting the plea offer (Docket No. 46, Memorandum Opinion at

---

[1] The Presentence Investigation Report ("PSR") provides a total offense level of 34 based on its inclusion of two additional points, pursuant to U.S.S.G. § 2D1.1(b)(1), resulting from Berkeley's possession of a firearm at the time of his arrest. PSR ¶ 25. Although the defense has not objected to the inclusion of these two additional points, the government is reluctant to endorse the application of U.S.S.G. § 2D1.1(b)(1) in this case because Berkeley was arrested nearly a year after his commission of the offenses charged in the Indictment, and, moreover, under the plea agreement (and even according to the PSR), Berkeley's relevant conduct specifically excluded the 31 grams of crack recovered at the time of Berkeley's arrest, and included only the drugs sold in 2005 (totaling approximately 124 grams of cocaine base). The government therefore submits that Berkeley's total offense level is 32, and, as discussed below, the appropriate range under the Sentencing Guidelines is 151 to 188 months of incarceration. Nonetheless, in determining where within this range to sentence the defendant, the Court can and should take into consideration the evidence that came to light at the time of Berkeley's arrest. Indeed, as discussed below, the 31 grams of crack and semiautomatic firearm Berkeley possessed when arrested support a sentence at the high end of his Guidelines range (i.e., 188 months' imprisonment).

[2] To establish that withdrawal was appropriate, Berkeley was required to assert a viable claim of innocence, and show that his guilty plea was somehow tainted and that the delay between the guilty plea and the motion to withdraw did not prejudice the government's ability to prosecute the case. United States v. Curry, 494 F.3d 1124, 1128 (D.C. Cir. 2007); accord United States v. West, 392 F.3d 450, 455 (D.C. Cir. 2004) (quoting United States v. Hanson, 339 F.3d 983, 988 (D.C. Cir. 2003)). The government did not claim any prejudice as a result of Berkeley's motion. Thus, to satisfy his burden, Berkeley maintained that his plea was constitutionally deficient because, according to Berkeley, he was pressured into entering his plea by, and received ineffective assistance from, his former attorney. Berkeley also alleged that he was legally innocent of the charges because he was pressured into selling the drugs by the government's confidential informant. Berkeley made materially false statements under oath in support of all three of these claims.

4).³  The Court also discredited Berkeley's testimony that he informed Doug Wood that the government's informant had pressured and threatened him (Docket No. 46, Memorandum Opinion at 7-8).⁴  Finally, in ruling that Berkeley had not established a viable claim of innocence, the Court found that there was "no credible evidence that any conduct occurred which would have likely 'overborne' the Defendant's will." (Docket No. 46, Memorandum Opinion at 11.)  The Court therefore implicitly rejected Berkeley's contention that the informant had threatened Berkeley, thus pressuring him into selling drugs to the informant (see 8/9/07 Tr. 13-16).  Rather, the Court concluded that "the informant's conduct in this case was similar to any 'garden-variety' drug transaction." (Docket No. 46, Memorandum Opinion at 11.)

      11.     The Court's findings make clear that Berkeley testified falsely in stating 1) that his attorney "scared" him, thereby pressuring him to accepting the plea offer; 2) that the informant pressured him into selling the drugs by sending him a threatening letter; and 3) that he informed his

---

      ³     At the hearing, Berkeley claimed that Doug Wood was so angry in the cellblock moments before the plea hearing that Berkeley became "scared" of Wood and entered his plea out of fear (8/9/07 Tr. 26-27; Docket No. 46, Memorandum Opinion at 4).  As the Court specifically found, "The Defendant's testimony was simply not credible." (Docket No. 46, Memorandum Opinion at 4.)  Commenting that Berkeley's testimony "clearly served his own self-interest in trying to withdraw the guilty plea," the Court credited the testimony of Doug Wood, who contradicted Berkeley's testimony (id.).  Simply put, as the Court found, Doug Wood did not "scare" Berkeley or pressure Berkeley into entering his guilty plea.

      ⁴     In support of his claim that he was denied effective assistance of counsel as a result of Mr. Wood's representation, Berkeley contended that Wood failed to consider facts that supported an alleged defense of entrapment and duress (8/9/07 Tr. 20, 65).  Specifically, Berkeley testified that he had informed Doug Wood about a threatening letter the government's informant had sent him, in which the informant allegedly pressured Berkeley into selling drugs to the informant (id. at 16-17, 36).  Doug Wood testified to the contrary, insisting that Berkeley never mentioned that the informant had pressured him at all, or that the informant ever sent Berkeley a threatening letter (id. at 121-23).  The Court specifically credited Doug Wood's testimony, and concluded that Berkeley failed to tell Mr. Wood about any such letter (Docket No. 46, Memorandum Opinion at 7-8).

attorney about the threatening letter and pressure from the informant. Where a defendant obstructs justice by falsely testifying in support of a motion to withdraw a guilty plea, the Sentencing Guidelines call for an enhancement to the defendant's offense level pursuant to U.S.S.G. § 3C1.1. See, e.g., United States v. Carroll, 412 F.3d 787, 792 (7th Cir. 2005); United States v. Adam, 296 F.3d 327, 335 (5th Cir. 2002) ("[S]tatement under oath regarding the circumstances surrounding his guilty plea, which the district court found to be untruthful, . . . led the court to impose the obstruction of justice enhancement"); United States v. Freixas, 332 F.3d 1314, 1321 (11th Cir. 2003) (applying commentary to § 3C1.1 that obstruction of justice can consist of "providing materially false information to a judge"); accord U.S.S.G. § 3C1.1 (application note 4(b)). Here, the government has shown, by clear and convincing evidence, that Berkeley's testimony was wilfully false and material to the proceedings. See United States v. Gaviria, 116 F.3d 1498, 1518 (D.C. Cir. 1997) (upholding sentencing court's application of obstruction of justice enhancement based on "clear and convincing evidence" that the defendant wilfully gave materially false testimony, where district court credited a witness's testimony that contradicted defendant's testimony), cert. denied sub nom., 522 U.S. 1082, 1132 (1998).

12.     Berkeley's total criminal history score is 5 points, U.S.S.G. §§ 4A1.1(b), 4A1.1(d), 4A1.2(a)(2), and 4A1.2(k)(1), placing him in criminal history Category III. U.S.S.G. Ch. 5, Part A. Accordingly, based on a total offense level of 32, the Berkeley's applicable range of incarceration is 151 to 188 months of imprisonment. U.S.S.G. Chapter 5, Part A.[5]  The Sentencing Guidelines

---

[5]     In the event that the Court adopts the PSR's application of U.S.S.G. § 2D1.1(b)(1) and the total offense level stated in the PSR (i.e., 34), Berkeley's recommended range of incarceration under the Sentencing Guidelines would be 188 to 235 months' imprisonment. U.S.S.G. Chapter 5, Part A. The government submits that a sentence within that range would be reasonable as well.

also require a period of supervised release of five years. U.S.S.G. §5D1.2(c). The fine range under the Sentencing Guidelines is $17,500 to $4,000,000. U.S.S.G. §§ 5E1.2(c)(3) and (c)(4).

Sentencing Recommendation

13. The government recommends that Berkeley be sentenced to period of incarceration at the high end of his Guidelines range (i.e., 188 months' imprisonment), followed by 5 years of supervised release. Under the plea agreement, the parties agreed that a sentence within the Guidelines range would constitute a reasonable sentence, and a review of the pertinent sentencing factors demonstrates that the Government's recommendation is not only reasonable but also appropriate.

14. In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the Supreme Court invalidated the statutory provision that made the Sentencing Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1). Booker, 125 S. Ct. at 756. Thus, imposition of a sentence consistent with the Sentencing Guidelines is now voluntary. Id.

15. Nonetheless, the Supreme Court recently held that a district court must begin all sentencing proceedings by correctly calculating the applicable Guidelines' range. See United States v. Gall, __ U.S. __, 2007 WL 4292116 at *7 (December 10, 2007) ("As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark"). The district court must then consider all of the applicable factors set forth in the sentencing statute, Title 18 United States Code, Section 3553(a). See id. The statute provides, in pertinent part, that when fashioning a sentence, courts should consider:

>(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>(2) the need for the sentence imposed–
>
>>(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>>(B) to afford adequate deterrence to criminal conduct;
>>
>>(C) to protect the public from further crimes of the defendant; and
>>
>>(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
>(3) the kinds of sentences available;
>
>(4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;
>
>(5) any pertinent policy statement issued by the Sentencing Commission . . .[;]
>
>(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
>(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

      16.    The Sentencing Guidelines themselves are designed to calculate sentences in a way that best implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Sentencing Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). Each Supreme Court Justice in the various opinions in <u>Booker</u> recognized the express national policy goals, as articulated by Congress, that sentences

be based on the offender's actual conduct and history, and that sentences be uniform across the country, to the extent possible. See, e.g., id. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 ("Congress' basic statutory goal – a system that diminishes sentencing disparity – depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.")

17.     As the Supreme Court has said, the Sentencing Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. See United States v. Rita, 127 S. Ct. 2456 (2007). The Sentencing Guidelines represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. Indeed, the Sentencing Commission formulated the Sentencing Guidelines only after initially canvassing prior sentencing practice and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence. See United States Sentencing Comm'n, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of

Sentencing Guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). The Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Sentencing Guidelines in light of what it learns." Booker, 125 S. Ct. at 766-67 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Sentencing Guidelines accordingly").

18.     Thus, the Sentencing Guidelines themselves seek to implement – in a fair and uniform way – the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in Gall. See Gall, 2007 WL 4292116 at * 7. It therefore remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by the district court. In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for Guidelines sentencing. The government therefore respectfully recommends that the Court sentence Berkeley within the applicable Sentencing Guidelines range, and, as described below, the recommended sentence would best effectuate the purpose of the factors enumerated in the sentencing statute, Title 18 United States Code, Section 3553(a).

19.     First, the offense Berkeley committed is a serious offense, as demonstrated by Congress's imposition of a mandatory minimum sentence of 10 years' imprisonment. It is without question that crack cocaine distribution has had devastating affects on the community, not only based on the manner in which it debilitates individuals addicted to the controlled substance, but also as a result of the inherent violence that comes from the drug trafficking business. Moreover, Berkeley's total offense level under the Sentencing Guidelines does not fully capture the seriousness of

Berkeley's offenses in light of the fact that, under the plea agreement, as well as the PSR, Berkeley's relevant conduct does not account for the 31 grams of crack or the semiautomatic firearm recovered on the date of his arrest.[6]

20.     Berkeley's conduct in this case is consistent with his past criminal behavior. Berkeley was convicted of drug possession with the intent to distribute marijuana and possession of cocaine in 2002, when Berkeley was 20 years of age. In addition, prior to the offenses in this case, he was arrested for drug trafficking related offenses on at least five separate occasions. Although none of those arrests led to convictions, the evidence at the motion hearing in this case confirmed that Berkeley actually committed many of those drug trafficking offenses. At the motion hearing, Berkeley admitted to possessing 62 grams of crack cocaine on at least one occasion before he sold crack to the informant (8/9/07 Tr. 67-69). Defendant admitted to selling drugs at least "a couple of times" when he was approximately 17 years old (id.). He also admitted to being the passenger in the vehicle that was pulled over by the police in April 2000 in Maryland, from which the police recovered a substantial amount of crack cocaine (id. at 73-75). At the motion hearing, the defense stipulated to the statement of probable cause from that prior case, which demonstrated that Berkeley was the individual who engaged in the hand-to-hand transaction on April 4, 2000 (id. at 148-150). After the officers removed Defendant and the driver from the vehicle, the officers recovered 69 small bags that amounted to 17.8 grams of crack cocaine (id.). Finally, the evidence at the motion hearing

---

[6]     Had Berkeley been prosecuted in Maryland based on his conduct at the time of his arrest, Berkeley would have been subjected to an additional mandatory minimum sentence of 10 years' imprisonment. See 18 U.S.C. § 924(c)(1); 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii). Even without being prosecuted in Maryland, had the 31 grams of crack been included in Berkeley's relevant conduct, as well as the recovered firearm, his offense level under the Sentencing Guidelines would have increased four levels, and his recommended range of punishment would have been 235 to 293 months' imprisonment. U.S.S.G. Ch. 5, Part A.

showed Berkeley was extremely familiar with prices for large quantities of drugs (see, e.g., id. at 69, 77). Thus, the evidence at the motion hearing regarding these prior drug transactions demonstrates that Berkeley's criminal history score, which includes only one conviction, clearly understates the length of his tenure in the drug trafficking business.[7]

21.  A sentence within the defendant's Sentencing Guidelines range furthers the goals of deterrence and protecting the community from these types of crimes. The distribution of narcotics, such as crack cocaine, is a serious offense. Indeed, the business of distribution of drugs is an inherently dangerous activity, subjecting the community to the proliferation of and use of dangerous weapons. See e.g., United States v. Jenkins, 928 F.2d 1175, 1180 (1991) (D.C. Cir. 1991) (permitting government's expert to testify that those who deal drugs typically keep firearms for protection, reasoning that "[w]eapons are, in short, tools of the trade," and admitting ammunition as 404(b) evidence). Berkeley is clearly a danger to the community given not only that he has had a lengthy history of selling drugs, but also the fact that Berkeley he has resorted to using firearms in public in connection with his drug trafficking business, as demonstrated by law enforcement's recovery of drugs and a loaded semiautomatic firearm at the time of Berkeley's arrest. Berkeley's premature release would subject the community to further risk of narcotics distribution and potential gun violence and would signal to the community that these crimes do not carry serious penal

---

[7]  As further testament to Berkeley's longstanding success as a drug dealer, the Government provided uncontested evidence that, at the time of Berkeley's arrest in 2006, law enforcement recovered 31 grams of crack cocaine from his person, plus a firearm and over $90,000 from inside Berkeley's vehicle, which Berkeley was on the verge of entering when he was stopped (8/9/07 Tr. 75-77; see also Statement of Offense). Berkeley's testimony that he sold drugs only to the informant and the undercover officer and that he has not sold drugs since September 21, 2005, was inconsistent with his physical possession of 31 grams of crack on his person in July 20006, several months after the informant had been reincarcerated in April 2006, and nearly a year after the sales giving rise to the charges in this case.

consequences. The government's recommended sentence accomplishes the worthy goals of protecting the community from the commission of further drug distribution by Berkeley himself, as well as deterring other individuals in the community from committing these types of offenses.

22. With respect to Berkeley's rehabilitative needs, Berkeley has been placed on probation in the past, and indeed was under supervision at the time he committed the offenses in this case. Berkeley has made a career of dealing drugs, as demonstrated by the testimony established at the motion hearing, described above. He has already been given sufficient opportunity to prove himself to the Court and the community, but he has chosen to persist in his life of crime. Berkeley's track record suggests he is not amenable to reforming his behavior and that his premature release would cause likely harm to the community. A sentence consistent with the Sentencing Guidelines is therefore necessary.

23. Not only is rehabilitation unlikely given Berkeley's long history of drug distribution, and his performance on probation, but significantly, Berkeley did not fully accept responsibility for his conduct, as is evident by the filing of his motion to withdraw his guilty plea. Moreover, Berkeley attempted to obstruct justice with his false testimony during the hearing on his motion. Berkeley's unwillingness to come to terms with the fact that he is the only person responsible for his criminal conduct, and to accept that the life his has lived has been harmful to the community, makes Berkeley an unlikely candidate for successful rehabilitation.

24. None of the factors enumerated in Section 3553(a) suggest an appropriate reason or extraordinary circumstance for the Court to depart from the recommended range or to impose a non-Guidelines sentence. Indeed, several factors here support a sentence at the high end of Berkeley's Sentencing Guidelines range given that his total offense level does not fully capture the seriousness

of the offense, his criminal history score understates his true record as a drug dealer over the last ten years, and the unlikelihood that Berkeley will reform his behavior once released.

WHEREFORE, based upon the above discussion, and the information reflected in the presentence report, the United States respectfully recommends a period of a minimum of 188 months of incarceration, followed by a 5 year period of supervised release.

Respectfully,

JEFFREY A. TAYLOR
United States Attorney

By: _____/s/_____
PERHAM GORJI
ASSISTANT UNITED STATES ATTORNEY
Federal Major Crimes Section
United States Attorney's Office
555 Fourth Street, N.W., Room 4233
Washington, D.C. 20530
Phone: (202) 353-8822
Fax: (202) 616-3782

CERTIFICATE OF SERVICE

I hereby certify that a copy of this motion has been served by first class mail upon counsel of record for the defendant, Harry Tun, Esquire, 400 Fifth Street, N.W., #300, Washington, D.C. 20001, this 7th day of February, 2008.

_____/s/_____
PERHAM GORJI, AUSA